159 F.3d 1001
 130 Ed. Law Rep. 480, 8 A.D. Cases 1273,
13 NDLR P 99
 Marvin O. ROSS, Plaintiff-Appellee,
v.
INDIANA STATE TEACHER'S ASSOCIATION INSURANCE TRUST,
Defendant-Appellant.
Marvin O. ROSS, Plaintiff-Appellant,
v.
INDIANA STATE TEACHER'S ASSOCIATION and Indiana State
Teacher's Association Insurance Trust, Defendants-Appellees.
 Nos. 97-3153, 97-3263.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 20, 1998.
Decided Sept. 3, 1998.
 
 James P. Fenton (argued), Alan VerPlanck, Eilbacher Scott, P.C., Fort Wayne, IN, Cathleen M. Shrader, Barrett & McNagny, Fort Wayne, IN, for Marvin O. Ross.
 Bart A. Karwath, Howard E. Kochell (argued), Barnes & Thornburg, Richard J. Darko, Lowe, Gray, Steele & Darko, Indianapolis, In, for Indiana State Teacher's Association Insurance Trust.
 Wayne O. Adams, III (argued), Johnson, Smith, Pence, Densorn, Wright & Heath, for Indiana State Teacher's Association.
 Before BAUER, RIPPLE and ROVNER, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 Marvin O. Ross filed this action in the district court on July 27, 1995, against the Indiana State Teacher's Association ("ISTA") and the Indiana State Teacher's Insurance Trust (the "Trust"). In his complaint, he alleged a claim against the Trust under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, claims against both defendants under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and several pendent state law claims against both defendants.[1] On February 7, 1997, the district court granted summary judgment in favor of ISTA on Mr. Ross' ADA claim and dismissed the remaining state law claims against ISTA without prejudice under 28 U.S.C. § 1367(c). See Ross v. Indiana State Teacher's Ass'n, 955 F.Supp. 1025, 1030-32 (N.D.Ind.1997). In addition, the district court granted the Trust's motion for partial summary judgment with respect to the ERISA claim. See id. at 1028-30. In April 1997, the case proceeded to trial on the only remaining claim--the ERISA claim against the Trust. Following a bench trial, the district court found in favor of Mr. Ross on that claim.
 
 
 2
 In this appeal, the Trust seeks reversal of the district court's judgment in favor of Mr. Ross on his ERISA claim. Mr. Ross cross-appeals from the district court's grant of summary judgment in favor of ISTA on his ADA claim. For the reasons set forth in the following opinion, we reverse the district court's judgment in favor of Ross on the ERISA claim and remand for further proceedings; we affirm the grant of summary judgment in favor of ISTA on the ADA claim.
 
 
 3
 * BACKGROUND
 
 A. Facts
 1.
 
 4
 Marvin Ross worked for the Indiana State Teacher's Association from 1971[2] until his termination in December 1994 as the UniServ Director for Fort Wayne, Indiana. ISTA is a labor organization that represents teachers throughout the State of Indiana. As an ISTA UniServ Director, Mr. Ross was responsible for representing the Fort Wayne Education Association and its teacher members by providing advice and consultation to them with respect to matters including collective bargaining, grievance processing, unfair labor practices, organizing, program development and other employment-related matters. Mr. Ross' position required that he visit various schools in his territory and that he attend a number of community events and meetings, including teacher meetings, collective bargaining meetings and school board meetings.
 
 
 5
 Mr. Ross has suffered from a degenerative hip condition since 1958. That condition has caused him to undergo numerous surgeries, including full hip replacements. In fact, he had undergone five surgical procedures prior to his employment with ISTA in 1971, and he had five additional surgeries during his tenure with ISTA. ISTA was aware of Mr. Ross' medical problems at the time it hired him, and it accommodated him throughout his 23-year employment with ISTA.[3]
 
 
 6
 In September 1992, Mr. Ross visited the Mayo Clinic and was examined by Dr. Miguel Cabanela. Dr. Cabanela wrote a report concluding that Mr. Ross' condition was such that he could not "function effectively at his work" and therefore that he "should be taken off work on an indefinite basis." R.87, Ex.12. Moreover, Dr. Cabanela expressed his opinion that Mr. Ross' condition was "permanent." As a result of this recommendation, Mr. Ross went on indefinite sick leave.[4] Because he indicated that his condition was permanent, ISTA posted a vacancy in the UniServ Director position in Fort Wayne. However, Mr. Ross expressed his desire to return to his position after further surgery, and ISTA agreed to delay filling the position until Mr. Ross received a post-operative prognosis from his doctor.
 
 
 7
 In February 1993, Dr. Cabanela performed another total hip replacement surgery on Mr. Ross. On March 29, 1993, Mr. Ross completed the 180-day waiting period required to be eligible to receive long-term disability benefits under the disability policy administered by the Trust.[5] Mr. Ross had applied for long-term disability benefits under the policy, and he began receiving them after the waiting period. The parties do not dispute that he was "totally disabled" within the meaning of the policy at that time. The policy defines the term "total disability":
 
 
 8
 "Total Disability" (or Totally Disabled) for the first sixty (60) months of disability means that the Participant is disabled and unable to perform the substantial duties of the Participant's employment....
 
 
 9
 R.87, Ex.6.
 
 
 10
 On May 14, 1993, Dr. Cabanela wrote that Mr. Ross was recuperating satisfactorily but that it was "unpredictable when and if he will be able to return to work." R.87, Ex.16. Because the UniServ Director spot had been left open since September 1992, ISTA wrote Mr. Ross and explained that the position could not be left vacant any longer unless ISTA could be assured that he would return by September 1, 1993. Mr. Ross did not respond to this letter, and ISTA hired a new director for Fort Wayne.
 
 
 11
 On September 15, 1993, Mr. Ross applied for additional disability benefits from the Indiana State Teacher's Retirement Fund, and he began receiving those benefits in October 1993. Therefore, Mr. Ross at that time was receiving Social Security disability benefits, long-term disability benefits from the Trust[6] and benefits from the Retirement Fund.
 
 2.
 
 12
 In February 1994, the Trust's third-party administrator, the Huttleston Benefit Group ("Huttleston"), requested that Dr. Cabanela complete a questionnaire to determine whether Mr. Ross remained "totally disabled" under the Trust's disability plan. Although Dr. Cabanela's response indicated that Mr. Ross was still "totally disabled," he also indicated that Mr. Ross could perform sedentary work if it did not require excessive walking or use of stairs. This mixed response led Huttleston to question further whether Mr. Ross was still entitled to receive long-term disability benefits from the Trust. Consequently, Huttleston contacted Bruce Rogers, the CEO and Director of the Trust, to determine whether an independent medical examination ("IME") of Mr. Ross should be obtained to ascertain whether he remained "totally disabled." Rogers replied that he believed it likely that Mr. Ross would be returning to work and therefore suggested that Huttleston defer seeking an IME until Mr. Ross had additional time to recuperate.
 
 
 13
 By July 1994, Mr. Ross had not returned to work and Huttleston again requested permission from Rogers to obtain an IME; at that time, Rogers agreed to request an IME. The examination was conducted by Dr. Michael Keating, a physician at the Center for Hip and Knee Surgery in Mooresville, Indiana. Dr. Keating concluded that Mr. Ross was capable of working if he was not required to move very often, lift objects or climb stairs, and if he could use a cane full time. Dr. Keating noted that the hip "actually looks outstanding" and that Mr. Ross would be capable of doing "some type of work" in keeping with the restrictions Dr. Keating set forth. R.87, Ex.72. After this report, Huttleston requested subsequent clarification from Dr. Keating. In response, Dr. Keating suggested that Mr. Ross would be able to return to work if he could use a wheelchair to prevent him from getting up and down too often.
 
 
 14
 After considering Dr. Cabanela and Dr. Keating's reports and the job requirements of a UniServ Director, a three-person committee at Huttleston determined that Mr. Ross was no longer "totally disabled" under the terms of the Trust policy because he was able to perform the substantial duties of his employment. Accordingly, Huttleston advised Rogers that it believed Mr. Ross' benefits should be terminated. Rogers, though authorized to overturn that decision, did not disagree. Consequently, Huttleston sent Mr. Ross a letter on October 11, 1994, indicating that his long-term disability benefits would be terminated as of October 31, 1994.[7]
 
 
 15
 On October 17, 1994, Mr. Ross' PSO[8] representative, Donald Thompson, contacted ISTA and stated that Mr. Ross was ready to return to work. ISTA responded that it had a vacant UniServ Director position in its Shelbyville, Indiana office. ISTA also inquired when Mr. Ross would be able to start work and what accommodations would be necessary. On October 28, 1994, Thompson sent a letter reporting that Mr. Ross was available to return to work as of November 1, 1994. Attached with the letter was a list of suggested accommodations required of ISTA. Thompson made it clear in forwarding those suggested accommodations that "[t]he wording is Mr. Ross' and not that of PSO." R.87, Ex.23. This list of 19 accommodations was broad in scope. It included such requests as "[m]eetings with teachers shall be held in the UniServ Office" and accommodation "by insuring that I never have to move quickly, such as to avoid a running student." Id. Mr. Ross points out that Warren Williams, Executive Director of ISTA, was angered by the suggested accommodations. Williams testified that the requests were unreasonable and that Mr. Ross knew that some of them could not have been met. Doubting that the list was "recommended by any medical professional(s) or anyone other than Mr. Ross," ISTA requested on November 1, 1994, that Mr. Ross provide a statement from his physician regarding the "medical restrictions on his ability to work." R.87, Ex.24.
 
 
 16
 On November 3, 1994, Thompson wrote to ISTA stating that Mr. Ross would be asked to obtain a letter from his physician indicating that he "is able to return to work," and that "[w]e can continue to work on identification of needed accommodations from that point forward."[9] R.87, Ex.25. ISTA, on November 9, 1994, in light of Thompson's statement that Mr. Ross would be obtaining the letter from his physician, sent Mr. Ross a letter instructing him to report to work on November 28, 1994, at the Shelbyville office. ISTA further stated in that letter that it would "make those reasonable accommodations which are required under the Americans With Disabilities Act so that you can continue your career of employment with ISTA." R.87, Ex.27. However, ISTA warned Mr. Ross that "[f]ailure to report to work as indicated will be taken as a resignation indicating your intention to not return to work for ISTA." Id.
 
 
 17
 On November 10, 1994, Mr. Ross' physician, Dr. Phillip Johnson, sent a letter to ISTA concerning the accommodations required for Mr. Ross to return to work. In that letter, Dr. Johnson stated that it was his "opinion that Mr. Ross should not return to work, but it would require ALL the above accomodations [sic] if he were to return." R.87, Ex.29 (emphasis in original). ISTA responded to the requested accommodations in a letter dated November 18, 1994, indicating that it was willing to provide the majority of the requested accommodations. ISTA addressed each accommodation requested and indicated that it would, inter alia, agree to limit the use of stairs by scheduling meetings on the first floor of buildings where meetings were necessary, allow Mr. Ross to wear athletic shoes to provide sure footing, provide a parking space close to the office for his exclusive use, allow adjustment of Mr. Ross' work schedule to accommodate medical appointments, make alterations to the restroom in the Shelbyville office to provide for a person with disabilities, ensure that the doorways in the office were wide enough for wheelchair access, and make adjustments to the level of Mr. Ross' desk, computer table and work table to accommodate work from a wheelchair. However, ISTA stated that it was unable to schedule all meetings with teachers at the Shelbyville office. Moreover, ISTA stated that, in its view, certain of the accommodations requested were within Mr. Ross' control and that it could not assist him with respect to those matters. For example, Dr. Johnson's letter states that "[Mr. Ross] must be protected against having to engage in sudden movement, as such movement could cause severe damage to his hip if he should dislocate it or fall." R.87, Ex.29. ISTA's response was, "It seems to us that is Mr. Ross's responsibility in that only he would know when he must engage in such movements." R.87, Ex.30. Mr. Ross notes that ISTA never actually undertook to make the Shelbyville office wheelchair-accessible by widening the doors or providing the alterations to the restroom.
 
 
 18
 Before Mr. Ross received ISTA's response to Dr. Johnson's list of accommodations, Mr. Ross wrote a letter responding to ISTA's instruction that he was to report to work on November 28, 1994. Mr. Ross explained that he would return to work at that time, but stated that "it was not I that suggested that I was physically ready (my doctor has not released me) to return to work." R.87, Ex.29.
 
 
 19
 Upon receiving this letter from Mr. Ross, ISTA concluded that Mr. Ross was not, in fact, released to work. Therefore, ISTA informed him on November 23, 1994, that he should not report to work until he could provide a letter from his doctor indicating that he was able to return without posing a threat of harm to himself; ISTA stated that if such a letter was not forthcoming by December 2, 1994, he would be terminated.[10]
 
 
 20
 The penultimate salvo in this barrage of correspondence was fired by Mr. Ross' attorney on November 29, 1994. That letter complained that Mr. Ross was in an awkward position because the Trust maintained that he was able to return to work and therefore had terminated his benefits. At the same time, according to Mr. Ross, ISTA would not provide him the necessary accommodations in accord with his doctor's requests and had threatened to terminate him if he failed to meet its "impossible deadline." The attorney further wrote:
 
 
 21
 Neither Mr. Ross nor any of his physicians have suggested that he is able to return to work except under the very restricted circumstances set forth by Mr. Ross' personal physician Phillip J. Johnson, M.D.
 
 
 22
 It was and is Mr. Ross' personal opinion that ISTA cannot provide him with employment within the strict guidelines set forth by Dr. Johnson and your November 23, 1994 letter confirms this....
 
 
 23
 ....
 
 
 24
 On behalf of Mr. Ross, I can only reasonably conclude that you are agreeing that Mr. Ross continues to be disabled--that is, incapable of safely performing the ordinary duties of his job.
 
 
 25
 R.87, Ex.36. Finally, when Mr. Ross failed to produce a release from his physician, ISTA informed him on December 4, 1994, that he was terminated.
 
 3.
 
 26
 Unsuccessful in his efforts to return to work for ISTA, Mr. Ross pressed forward in his endeavor to overturn the Trust's decision to terminate his long-term disability benefits. The hearing on Mr. Ross' administrative appeal was held on February 3, 1995. That hearing was conducted by the Trust's Board of Trustees. Because three of the Trustees were also officers of ISTA, they recused themselves from the proceedings. Consequently, the hearing was attended by a quorum of five Trustees.
 
 
 27
 At the hearing, the Trustees reviewed Mr. Ross' claim and they asked questions of him, including how he spends an average day. In that regard, Rogers, one of the Trustees in the quorum, presented a videotape of Mr. Ross during a recent visit to his daughter's house in Florida. Rogers had commissioned a private investigator to film Mr. Ross to determine the extent of his actual disabilities. Mr. Ross notes that never, in the ten-year history of the Trust, had such a video been played at an administrative hearing. The tape showed Mr. Ross slowly walking into and out of a grocery store, then slowly, one bag at a time, carrying groceries into his daughter's home. See R.90 at 6. Subsequently, the Trustees heard from the Associate Executive Director for Field Services at ISTA regarding the duties of a UniServ Director and the accommodations that had been offered to Ross to enable him to return to his position at ISTA.
 
 
 28
 On February 21, 1995, Rogers, as CEO and Director of the Trust, sent Ross a letter informing him that the Trustees had decided to affirm Huttleston's termination of his disability benefits. The letter stated that the "Trustees made their decision in the context of the requirements of your professional position as UniServ Director, the restrictions placed upon you by your doctors and the accommodations offered by your employer as required by the [ADA]." R.87, Ex.47. Mr. Ross subsequently filed suit against ISTA and the Trust in July 1995.
 
 B. Proceedings in the District Court
 
 29
 Mr. Ross brought ADA claims and pendent state law claims against both the Trust and ISTA; he also brought an ERISA claim against the Trust. However, he dropped his ADA claims and pendent state claims against the Trust, and pressed those claims only against ISTA. The district court, after considering summary judgment motions from ISTA and the Trust, granted summary judgment in favor of ISTA on the ADA claim and dismissed the remaining state claims without prejudice. The district court concluded that there was no genuine issue of material fact with respect to whether Mr. Ross was a "qualified individual with a disability," and concluded that he was not such an individual because he was not capable of performing the essential functions of his job. See Ross, 955 F.Supp. at 1032. The district court based this decision on the ground that, because Mr. Ross maintained throughout the litigation that he was totally disabled and was entitled to long-term disability benefits under the Trust's policy, he could not "simultaneously argue that he is capable of performing the essential functions of his job." Id.
 
 
 30
 Only Mr. Ross' ERISA claim against the Trust survived the summary judgment phase of the litigation. After a two-day bench trial on that issue, the district court determined that the Trustees had abused their discretion in denying Mr. Ross' long-term disability benefits on the ground that he was not totally disabled within the meaning of the disability policy. Specifically, the court found that it was an abuse of discretion for the Trustees to consider the accommodations offered by ISTA to Mr. Ross in the course of deciding whether Mr. Ross was unable to perform his "substantial duties" within the meaning of the policy. In the district court's view, such a consideration was inconsistent with the plain and unambiguous language of the policy and therefore the Trustees had abused their discretion in denying Mr. Ross' benefits. The district court explained that Mr. Ross was unable to perform his substantial duties without accommodation and that, accordingly, he was entitled to long-term disability benefits.
 
 II
 DISCUSSION
 
 31
 On appeal there are two main claims which we must address. The first is the claim of the Trust, opposed by Mr. Ross, that the district court erred in concluding that the Trustees abused their discretion in considering the accommodations offered by ISTA in their determination regarding Mr. Ross' entitlement to disability benefits. The second is the claim of Mr. Ross, opposed by ISTA, that the district court erred in granting summary judgment in favor of ISTA on Mr. Ross' ADA claim. We shall address these issues in turn.
 
 A. ERISA Claim
 
 32
 The Trust challenges the district court's judgment that the Trustees abused their discretion in considering the reasonable accommodations offered by ISTA in the process of determining whether Mr. Ross was totally disabled under the disability policy. We review the district court's determination of this question of law de novo.
 
 1.
 
 33
 As an initial matter, we address the parties' dispute regarding the standard of review that governs this inquiry. The Trust suggests, in its brief to this court, that the Board's decision should be reviewed under the arbitrary and capricious standard. In contrast, Mr. Ross claims that the abuse of discretion standard applies.
 
 
 34
 We have explained on prior occasions that the Supreme Court, in Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), established that, "in interpreting benefits under an ERISA plan, a de novo standard of review is appropriate unless the plan documents give 'the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.' " Cozzie v. Metropolitan Life Ins. Co., 140 F.3d 1104, 1107 (7th Cir.1998) (quoting Firestone Tire, 489 U.S. at 115, 109 S.Ct. 948). The long-term disability plan at issue here clearly imparts discretionary authority to the plan administrator to interpret the terms of the plan. The plan provides in relevant part:
 
 
 35
 The Plan Administrator shall have the right to interpret the terms and provisions of the Benefit Plan and to determine any and all questions arising under the Benefit Plan or in connection with the administration of the Benefit Plan, including, without limitation, the right to remedy or resolve possible ambiguities, inconsistencies, or omissions, by general rule or particular decision.
 
 
 36
 R.87, Ex.6. When the administrator is given discretion to interpret the terms of the plan, the "extent of the deference given the administrator 'determines the extent of judicial deference.' " Cozzie, 140 F.3d at 1107 (quoting Morton v. Smith, 91 F.3d 867, 870 (7th Cir.1996)). This is the case because Firestone Tire "did not establish a single standard for reviewing the discretionary decisionmaking of plan fiduciaries" but instead "presented a 'smorgasbord of possibilities' for standards of review." Morton, 91 F.3d at 870.
 
 
 37
 In Morton, this court differentiated between the arbitrary and capricious standard of review and the abuse of discretion standard. We stated that when plan administrators are constrained to make "reasonable" interpretations of a plan, "their decisions are reviewed according to the familiar abuse-of-discretion standard." Id. In contrast, we explained, when the administrators need only "interpret the plan under the broad standard of good faith, their discretion is even more extensive, and judicial review is even more deferential." Id. In that case, the arbitrary and capricious standard applies.
 
 
 38
 The distinction between these standards is indeed nebulous; in fact, we have (both before and since our decision in Morton) treated these standards of review, in this context, as substantially equivalent. See Gallo v. Amoco Corp., 102 F.3d 918, 921 (7th Cir.1996) (stating that issue to be determined was whether "Amoco had abused its discretion, or, what amounts to the same thing, had acted arbitrarily and capriciously"), cert. denied, --- U.S. ----, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997); Lister v. Stark, 942 F.2d 1183, 1188 (7th Cir.1991) (observing that, after the Supreme Court's decision in Firestone Tire, some circuits used the arbitrary and capricious standard, some used the abuse of discretion standard and one court had found them to be interchangeable, and stating that we "are sympathetic to [the] unwillingness to split semantic hairs");[11] see also Chambers v. Family Health Plan Corp., 100 F.3d 818, 825 n. 1 (10th Cir.1996) (noting distinction drawn in Morton, but stating that "[m]ost courts, however, have held that this is a 'distinction without a difference' " (quoting Cox v. Mid-America Dairymen, Inc., 965 F.2d 569, 572 n. 3 (8th Cir.1992))).
 
 
 39
 Whatever the value of such a distinction between the standards of review may be, we conclude in this case that we need not determine whether such a distinction is viable. The Trust, in response to Mr. Ross' submission that it has attempted, for the first time in this appeal, to obtain review under the arbitrary and capricious standard, states in its reply brief that what it has argued is "that the proper ERISA standard of review is the heightened, deferential ERISA standard of judicial review" which is known "both as the 'abuse of discretion' standard and the 'arbitrary and capricious' standard." Trust's Reply Br. at 2. Moreover, in the Trust's view, "there simply is no practical difference between the abuse of discretion standard and the arbitrary and capricious standard." Id. Because the Trust perceives no distinction between the standards, we review the Board's decision to deny Mr. Ross' benefits under an abuse of discretion standard--which Mr. Ross asserts is the appropriate one and which the district court concluded was the correct standard.
 
 
 40
 In determining whether the Board of Trustees abused its discretion in denying Mr. Ross' benefits, we must determine not whether its decision is correct or whether we would have answered the question another way, but instead whether the Board's interpretation of the plan was unreasonable.[12] See Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan, 144 F.3d 1014, 1021 (7th Cir.1998) (stating that, under the arbitrary and capricious standard, "it is not our function to decide whether we would reach the same conclusion as the Plan or even rely on the same authority" and that we shall also "not set aside a plan's denial of benefits if the denial was based on a reasonable interpretation of the plan documents"), petition for cert. filed, 67 U.S.L.W. 3106 (U.S. July 31, 1998) (No. 98-209); cf. Ladd v. ITT Corp., 148 F.3d 753, 753-54 (7th Cir.1998) ("Since the [ERISA] plan authorized the plan administrator to use its discretion in making claims determinations, our role is the limited one of determining whether [the defendant] abused its discretion--acted unreasonably--or, as the cases say (but all these are different ways of saying the same thing), exercised its discretion in an 'arbitrary and capricious' manner." (citing cases)).
 
 2.
 
 41
 The district court ruled in favor of Mr. Ross on his ERISA claim; it determined that the Board of Trustees abused its discretion because it effectively defined the "unable to perform the substantial duties" language of the policy to include the words "with or without reasonable accommodation." R.90 at 7. The court found that the plain language of the plan did not include any reference to accommodations and therefore that the Board was unreasonable in construing the plan terms in that manner.
 
 
 42
 The Trust makes several arguments attacking the merits of the district court's decision.[13] In essence, the Trust asserts that the plan language is silent with respect to whether accommodations available to a person should be considered in determining whether a person is "totally disabled" under the plan. Recall that the definition of that term states only that a plan participant is totally disabled if he is "disabled and unable to perform the substantial duties of the Participant's employment." When a plan is silent about such an aspect of the plan's administration, the Trust submits, it is within the power of interpretation given to the Board to determine whether the accommodations offered an employee should be considered in ascertaining whether he is unable to perform the substantial duties of his employment.
 
 
 43
 In support of this proposition, the Trust relies upon Gallo v. Amoco Corp., 102 F.3d 918 (7th Cir.1996). In that case, the plan terms were silent with respect to the appropriate calculation method to be used in determining annual retirement benefits. Although the plan administrator there applied different interpretations of the same term in the plan, see id. at 922, the court upheld the administrator's interpretation of the plan. The court stated "[w]hen as in this case the plan document does not furnish the answer to the question, the answer given by the plan administrator, when the plan vests him with discretion to interpret it, will ordinarily bind the court." Id. The Trust maintains that this principle applies here; it reasonably interpreted the plan to permit consideration of the accommodations actually offered Mr. Ross in the process of ascertaining whether he was no longer able to perform the substantial duties of his employment.
 
 
 44
 The Trust also asserts that, as a practical matter, this interpretation of the plan is sensible in light of the ADA's requirements. The Trust notes that the ADA requires employers to make reasonable accommodations for disabled employees; in this case, ISTA agreed to make certain accommodations. It was reasonable, therefore, for the Trust to consider whether Mr. Ross was unable to perform the substantial duties of his employment in light of those accommodations that ISTA had agreed to make.
 
 
 45
 In response, Mr. Ross claims that the Board's interpretation of the plan language was not an interpretation at all but instead was effectively a rewriting of the plan to add a requirement that cannot be found in the plain language of the definition of "totally disabled." Mr. Ross relies primarily on the plan language for this argument, noting that the language is devoid of any reference to the ADA or an employer's ability or willingness to accommodate the plan participant in performing his substantial duties. Mr. Ross suggests that the Trust's argument constitutes an attempt to use the ADA as a sword to deny Mr. Ross his benefits, when in actuality it is a shield designed to protect those with disabilities.
 
 
 46
 Moreover, Mr. Ross relies on Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan, 85 F.3d 455 (9th Cir.1996). He construes this case as establishing the principle that an employer's reasonable accommodations cannot be taken into account in determining whether a person is disabled. In Saffle, according to Mr. Ross, the Ninth Circuit found that the plan administrator abused its discretion in interpreting the disability provision at issue to allow consideration of the accommodations the employer could make in determining whether the participant was totally disabled. See id. at 459-60. Mr. Ross urges that we should find similarly.
 
 
 47
 Because this issue is a matter of interpretation of an ERISA plan, we look to federal common law principles of contract interpretation to guide our inquiry. See Santaella v. Metropolitan Life Ins. Co., 123 F.3d 456, 461 (7th Cir.1997). Under those rules, it is generally the case that we "interpret the terms of the policy in an ordinary and popular sense, as would a person of average intelligence and experience." Id. (internal quotations omitted). However, as we recently explained, "while the starting point in resolving an issue of interpretation of an ERISA ... plan is the general law of contracts, the ending point may be different if the general law doesn't fit the issue because of something either in ERISA or in the nature of a pension plan." Mathews v. Sears Pension Plan, 144 F.3d 461, 466 (7th Cir.1998) (contrasting general contract rules with ERISA-specific rules). In that vein, we note that, although, generally, ambiguities in an insurance policy are construed in favor of an insured, in the ERISA context in which a plan administrator has been empowered to interpret the terms of the plan, this rule does not obtain. See Morton v. Smith, 91 F.3d 867, 871 n. 1 (7th Cir.1996) (explaining that rule of contra proferentem applies only when courts undertake de novo review of an administrator's interpretation of an ERISA plan). Therefore, if we find that a term of the plan is ambiguous, it need not be construed in favor of Mr. Ross.
 
 3.
 
 48
 We believe that the district court erred in concluding that the Board of Trustees abused its discretion by considering the actual accommodations offered by ISTA in determining whether Mr. Ross was unable to perform the substantial duties of his job. We agree with Mr. Ross that the plan is silent with respect to whether such accommodations may be considered. We believe, however, that the Board acted well within its discretion when it interpreted the plan to allow it to consider the accommodations to which ISTA agreed. The Board's job was to determine whether Mr. Ross was "unable to perform the substantial duties of [his] employment." In so doing, the Board expressly considered a number of factors, including "the requirements of your professional position as UniServ Director, the restrictions placed upon you by your doctors and the accommodations offered by your employer as required by the Americans with Disabilities Act." R.87, Ex.47. We think that this approach was reasonable in light of the plan language.
 
 
 49
 We think it worth noting that the Board considered the accommodations that ISTA actually agreed to make. The Board did not simply determine that, as a theoretical matter, there were some possible accommodations or other work available which might accommodate Mr. Ross. The Board's judgment was not based on hypothetical grounds but rooted explicitly in the precise accommodations agreed to by ISTA. In this context, we do not think that the Board of Trustees effectively modified or rewrote the terms of the plan; instead, it adopted a rational interpretation of the broad language of the plan. "When ... the plan document does not furnish the answer to the question, the answer given by the plan administrator, when the plan vests him with discretion to interpret it, will ordinarily bind the court. That is implicit in the idea of deferential review of the plan administrator's interpretation." Gallo, 102 F.3d at 922. The question raised here--whether the Board could consider the accommodations offered by ISTA for Mr. Ross--was not answered by the terms of the plan. We cannot say that it was unreasonable for the Board to have considered those accommodations in its effort to determine whether Mr. Ross was able to perform the substantial duties of his job.
 
 
 50
 We also do not think the decision in Saffle requires a different result. In Saffle, the interpretation of a total disability provision was also at issue. Saffle was a customer services clerk and her job was described by her employer as mostly sedentary; she was seated at least 80% of the time. Saffle, 85 F.3d at 457. Saffle applied for disability benefits after suffering complications from surgery on her foot. The plan language in that case provided that a person is "totally disabled" when "he is completely unable to perform each and every duty of his regular occupation." Saffle, 85 F.3d at 457. In the course of determining that Saffle was not totally disabled under that definition, the administrator construed the disability definition to mean " 'the inability to perform substantial portions of the employee's regular job.' " Id. Because work was available for which she was qualified that would have enabled her to work with her feet elevated, most examining physicians determined that Saffle was not totally disabled; accordingly, the administrator stated that " 'the weight of the medical opinion is that you could perform a substantial portion of your regular job with the accommodations that could have been made.' " Id. at 457-58. The Ninth Circuit found that the administrator abused its discretion by defining Saffle's "regular occupation" in a manner inconsistent with the plain language of the plan. Specifically, the court held that construing that term as allowing consideration of other work for which she was qualified (but that she was not previously performing) merged impermissibly the occupational and general disability aspects of the plan. See id. at 459. Therefore, the court ultimately concluded that the administrator "arbitrarily construed the Plan to include performing a substantial portion of 'work available for which she is qualified' with accommodations that could have been made." Id. at 460.
 
 
 51
 Saffle does not suggest that it is inappropriate to consider accommodations actually offered to an employee to determine whether he is able to perform the substantial duties of his regular job. The problem in Saffle with the accommodations that were considered was that they were essentially outside of the realm of Saffle's regular job and therefore were at odds with the policy language at issue. Moreover, the accommodations in that case do not appear to have been actually offered to Saffle; the employer simply stated, in seeking doctor's evaluations regarding her ability to work, that there was work available which would allow her to accommodate her disability.
 
 
 52
 We therefore hold that, under the plan language at issue here and in light of the Board's discretion to interpret the terms of the plan, it was not an abuse of discretion for the Board of Trustees to consider the actual accommodations offered Mr. Ross by ISTA in determining whether he remained totally disabled under the plan. Accordingly, the district court's judgment in favor of Mr. Ross on the ERISA claim is reversed.
 
 4.
 
 53
 The district court noted that, in addition to the issue we have discussed, there remained the issue as to whether the Board's use of the videotape at Mr. Ross' hearing and the alleged lack of notice to Mr. Ross that the videotape would be shown, rendered the decision of the Board arbitrary and capricious. Because the district court determined that the Trustees' use of reasonable accommodations standards rendered their decision infirm, an issue on which we now have expressed our respectful disagreement, the court explicitly reserved ruling on the manner in which the videotape was used. Accordingly, we must now remand the case to the district court for further consideration.
 
 B. ADA Claim
 
 54
 We turn next to Mr. Ross' challenge to the district court's grant of summary judgment in favor of ISTA on his ADA claim. We review de novo a district court's grant of summary judgment. See Talanda v. KFC Nat'l Management Co., 140 F.3d 1090, 1095 (7th Cir.1998), petition for cert. filed, 67 U.S.L.W. 3093 (U.S. July 2, 1998) (No. 98-37). Summary judgment is appropriate when the record reveals no genuine issue of material fact and the moving party, ISTA, is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In order for Mr. Ross to avoid summary judgment on his claim, he must "supply evidence sufficient to allow a jury to render a verdict in his favor." Nowak v. St. Rita High School, 142 F.3d 999, 1002 (7th Cir.1998) (internal quotations omitted). Presenting only a "scintilla" of evidence or mere conclusory allegations will not enable Mr. Ross to prevail. See id. (citing cases). In conducting our review, we construe the facts of record in the light most favorable to the nonmoving party, Mr. Ross. See Talanda, 140 F.3d at 1095. Moreover, in employment discrimination cases, where credibility and intent are crucial issues, we review the record with heightened scrutiny. See Vanasco v. National-Louis Univ., 137 F.3d 962, 964-65 (7th Cir.1998).
 
 1.
 
 55
 Mr. Ross brought a claim against ISTA under the ADA. The ADA prohibits employers from discriminating against a "qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). Such discrimination includes an employer's failure to make reasonable accommodations to the "known physical or mental limitations of an otherwise qualified individual with a disability who is an ... employee, unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). In order to succeed in an ADA claim, the plaintiff bears the burden of establishing that he is a "qualified individual with a disability." See McCreary v. Libbey-Owens-Ford Co., 132 F.3d 1159, 1164 (7th Cir.1997). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The determination regarding whether an individual is such a qualified individual must be made "as of the time of the employment decision." See Nowak, 142 F.3d at 1003. There is no dispute here that Mr. Ross is disabled. Instead, the dispute focuses, in part, on whether Mr. Ross is a "qualified individual."
 
 
 56
 There are two prongs to the "qualified individual" definition. First, the disabled individual must satisfy "the requisite skill, experience, education and other job-related requirements of the employment position [he] holds or desires." 29 C.F.R. § 1630.2(m). In light of Mr. Ross' 20+ year term of employment as a UniServ Director for ISTA, there is no dispute between the parties that he possesses the requisite skill and experience necessary to do the job. Second, the person must establish that he "can perform the essential functions of such position" with or without accommodation. Id. This aspect of the definition of "qualified individual" is in dispute.
 
 
 57
 Mr. Ross asserts that the evidence of record establishes that he was capable, with accommodation, of performing the essential functions of his position, or that at least there is a genuine issue of fact in this regard. In his view, moreover, ISTA broke off the requisite interactive process prematurely and thus failed to provide the reasonable accommodations that he needed in order to return to work. In contrast, ISTA maintains that it fully cooperated with Mr. Ross in an interactive process to determine what reasonable accommodations were necessary in order to enable him to return to work, but Mr. Ross made it clear that he was unable and unwilling to return on a basis that would enable him to perform the essential functions of his job. Therefore, in ISTA's view, Mr. Ross is not a "qualified individual with a disability" because he was unable to perform the essential functions of his job even with reasonable accommodations.
 
 2.
 
 58
 We examine first the interactive process that occurred here to determine whether ISTA may be liable under the ADA for its breakdown. In Beck v. University of Wisconsin Board of Regents, 75 F.3d 1130, 1137 (7th Cir.1996), we explained the ADA's requirements with respect to the interactive process:
 
 
 59
 Once an employer knows of an employee's disability and the employee has requested reasonable accommodations, the ADA and its implementing regulations require that the parties engage in an interactive process to determine what precise accommodations are necessary.... Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown [in the process]. But where ... the employer does not obstruct the process, but instead makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed, ADA liability simply does not follow.
 
 
 60
 Id. In this case, an interactive process clearly took place. In fact, the record reflects that ISTA had been aware of Mr. Ross' disability from the time of his hiring and that it had been in the practice of accommodating him by enabling him to work around his surgeries and his disability. For example, in this case, although Mr. Ross informed ISTA as of September 1992 that he was away from work indefinitely, it agreed to keep his position open for almost a year to see if he would be able to return to work.
 
 
 61
 Once the Trust informed Mr. Ross in October 1994 that his disability benefits would be terminated, he contacted ISTA expressing an interest in returning to work. ISTA at this point itself initiated the process of trying to accommodate Mr. Ross by explaining that it had a UniServ Director position open for him and by asking what accommodations Mr. Ross needed in order to return to work. Mr. Ross responded through his union representative with a list of accommodations; ISTA in turn believed that all of these accommodations were not medically necessary and asked Mr. Ross to obtain a statement from his physician regarding the medical restrictions on his ability to work. Prior to receiving that report, ISTA indicated to Mr. Ross that he should report to work on November 28, 1994. Mr. Ross then provided, by a letter dated November 10, Dr. Johnson's report and list of accommodations. ISTA responded to that list and agreed to the majority of the requested accommodations.[14]
 
 
 62
 Before Mr. Johnson received ISTA's response to his requested accommodations, he had received the letter indicating he was to report to work on November 28. He responded to that letter with one explaining that it was not his idea to return to work and that he had not been released by his doctor. Upon receiving this letter from Mr. Ross, ISTA sent another letter requiring him to obtain a release to return to work and, failing that, stating that he should not report. Mr. Ross believed this request was unreasonable because the only way he could obtain such a release was if ISTA agreed to all of his requested accommodations. ISTA, in turn, had already indicated that it was not willing to do that. In an attempt to avoid the deadline imposed on him to provide the medical release, Mr. Ross asked for a meeting to discuss the accommodations further. However, ISTA did not respond to this request. Finally, his attorney wrote to ISTA and made clear that Mr. Ross could not return to work and acknowledged that ISTA could not meet all of Mr. Ross' demands. ISTA's demand for a medical release was not met by the time it had set to receive one--December 2, 1994--and Mr. Ross was terminated.[15]
 
 
 63
 On this record, we do not think that a reasonable trier of fact could determine that ISTA bore the responsibility for the breakdown; it cannot be said that ISTA failed to engage in the informal interactive process required of it. See 29 C.F.R. § 1630.2(o)(3); Beck, 75 F.3d at 1136 (stating that "failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process"). ISTA had received strong indications that Mr. Ross was not ready to return to work, despite his originally stated intent to return as of November 1, 1994. Dr. Johnson's letter of November 10, 1994, containing the list of accommodations, indicated that he was reluctant to allow Mr. Ross to return at all. In that letter, Dr. Johnson stated, "I do not believe that it would be in Mr. Ross' benefit to return to any work" and that it "is still my opinion that Mr. Ross should not return to work, but it would require ALL the above accomodations [sic] if he were to return." R.87, Ex.29. In addition, after ISTA had responded, and acquiesced, to most of the demanded accommodations, it received from Mr. Ross the letter stating "it was not I that suggested that I was physically ready (my doctor has not released me) to return to work." Id. Finally, his attorney confirmed that he was still not physically able to meet the requirements of ISTA and that ISTA could not meet all of his demands for accommodation. Given these circumstances, it was reasonable for ISTA to want a medical release prior to allowing Mr. Ross to return to work.
 
 3.
 
 64
 We also find unavailing Mr. Ross' arguments to the effect that he was capable of returning to work with reasonable accommodation but ISTA refused to provide the necessary accommodations for him. In support of his contention, Mr. Ross cites various statements made by ISTA representatives, his doctor and himself to the effect that he is capable of performing his job with reasonable accommodation. For example, Mr. Ross notes that ISTA's Assistant Executive Director testified at the Trust's administrative hearing regarding his disability benefits that Mr. Ross would be capable of returning to work with the accommodations ISTA agreed to provide him. Moreover, Mr. Ross' physician, Dr. Johnson, concluded that he could perform the essential functions of his job if he were reasonably accommodated.[16] Mr. Ross himself also has testified as to his own belief that he could have returned to work.
 
 
 65
 However, as ISTA points out, Mr. Ross' argument and evidence here fall short of establishing his ability to perform the essential functions of his job with accommodation. The problem with Mr. Ross' argument is that he assumes away the thorny issue--the reasonable accommodations to be made that would enable him to perform the essential functions of his job. The statements by ISTA officials were made with the understanding that Mr. Ross would accept the accommodations to which ISTA agreed. However, at no time did Mr. Ross demonstrate that he was willing to return to work on those grounds. Indeed, he and his physician maintained that he could only return to work if all of his proposed accommodations were agreed to. We do not think that Mr. Ross, while denying his ability to return except with all of his requested accommodations, can rely on the statements of others expressing their opinions that he could have returned to work with fewer than all of those accommodations.
 
 
 66
 Notably, Mr. Ross has acknowledged that a substantial portion of the essential job duties of a UniServ Director involves time spent outside of the office in meetings at various locations.[17] Nevertheless, one of his demanded accommodations was that all teacher meetings be scheduled in the Shelbyville ISTA office. ISTA would not agree to such a demand. The essential job duties of a UniServ Director clearly involve meetings outside of the Director's office. Moreover, ISTA had established a school visitation program that was part of the Director's job function. There would be little point in having such a school visitation program for UniServ Directors if all of the teachers were required instead to meet the Director at his office. Given Mr. Ross' position that all of his requested accommodations were medically necessary and that at least one of those requests--that all meetings be held at his office--was clearly unreasonable, he has not demonstrated that he was willing or able to perform the essential functions of his job with reasonable accommodation. Accordingly, we conclude that the district court properly determined that Mr. Ross is not a "qualified individual with a disability." Mr. Ross has maintained, throughout this litigation, that he was totally disabled, unable to return to work and therefore entitled to long-term disability benefits. Given his consistent position that he is totally disabled, taken together with the evidence regarding his requested accommodations, it appears clear to us that Mr. Ross has not established a genuine issue of fact regarding whether he was able to perform the essential functions of his position with reasonable accommodation. Consequently, we affirm the district court's decision to grant summary judgment to ISTA on the ADA claim on this ground.
 
 Conclusion
 
 67
 The Trust in this case, through its Board of Trustees, reasonably considered the accommodations actually offered by ISTA in determining whether Mr. Ross was totally disabled within the meaning of the policy. Therefore, we reverse the district court's judgment in favor of Mr. Ross holding that the Trust abused its discretion in interpreting the policy in that manner and in denying Mr. Ross his disability benefits. The case is remanded for consideration of the remaining issue.
 
 
 68
 In addition, we conclude that Mr. Ross and ISTA engaged in an interactive process to reach a reasonable accommodation that would enable Mr. Ross to return to work. That process broke down when Mr. Ross failed to provide the requested release from his physician. Mr. Ross has not otherwise established that ISTA violated the ADA because he did not demonstrate that he could perform the essential functions of his job with reasonable accommodation. Consequently, we affirm the district court's grant of summary judgment to ISTA on Mr. Ross' ADA claim. ISTA may recover its costs on this appeal. The other parties shall bear their own costs.
 
 
 69
 REVERSED and REMANDED in part; AFFIRMED in part
 
 
 
 [1]
 On September 9, 1996, ISTA moved for summary judgment on all claims brought against it; on the same day, the Trust moved for summary judgment on the ADA claim and the pendent state law claims and moved for partial summary judgment on the ERISA claim, seeking to establish that the abuse of discretion standard applied to that claim. In response, Mr. Ross conceded summary judgment on his ADA and state law claims against the Trust, leaving only the ERISA claim against the Trust, but otherwise opposed the defendants' summary judgment motions
 
 
 [2]
 The parties state in their briefs that Mr. Ross' employment began with ISTA in 1971. However, Mr. Ross actually began his employment as the Executive Director of the Fort Wayne Education Association in 1971; the association merged with ISTA in 1972
 
 
 [3]
 ISTA notes that it permitted Ross to modify his school building visitation schedule when necessary and that it allowed him time off for his numerous surgeries and therapy sessions
 
 
 [4]
 In December 1992, while on sick leave, Mr. Ross applied for Social Security disability benefits. The request for benefits was denied; however, Mr. Ross requested reconsideration of that decision and the Social Security Administration decided in July 1993 that he was entitled to benefits retroactive to March 1993
 
 
 [5]
 The Trust is a nonprofit corporation governed by a Board of Trustees. The corporation was established to provide various fringe benefit plans primarily for the employees of Indiana school corporations and their dependents
 
 
 [6]
 Before Mr. Ross began receiving the long-term disability benefits from the Trust, he had received his full salary pursuant to the sick leave terms of the collective bargaining agreement negotiated between ISTA and the Indiana State Teacher's Association Professional Staff Organization ("PSO"), the union representing ISTA staff members. Once he began receiving the long-term disability benefits from the Trust, he was reduced to 66 2/3% of his regular salary
 
 
 [7]
 This decision was affirmed by Huttleston following submission of additional materials from Mr. Ross in December 1994, and Mr. Ross sought administrative review of that affirmance. The pertinent details of the administrative appeal are set forth in the text
 
 
 [8]
 See supra note 6
 
 
 [9]
 In this letter, Thompson also requested that ISTA clarify what the "essential functions" of the UniServ Director were. ISTA responded to that request and stated that all of the functions listed in the job description are essential functions. We note that the 15 responsibilities in that description are stated in general terms and do not clarify, for example, the extent to which Mr. Ross would have to travel, climb stairs, etc
 
 
 [10]
 Meanwhile, on November 22, 1994, Mr. Ross wrote to ISTA noting that ISTA had agreed to some of his requested accommodations. However, because they were "widely divided" over certain of the accommodations, Mr. Ross recommended that the parties (Ross, ISTA management, and PSO reps) hold a meeting to discuss further his accommodations
 
 
 [11]
 It is interesting to note that in Lister, the parties' stances were juxtaposed with those presented here. In that case, the party seeking the standard of review more deferential to the administrator asserted that the abuse of discretion standard, not the arbitrary and capricious standard, was appropriate. See id. at 1187
 
 
 [12]
 Mr. Ross also argues that our review of the Board of Trustees' decision to deny his benefits should be of the more "searching" judicial inquiry variety applied in cases in which a conflict of interest or bias has been shown. See Ladd v. ITT Corp., 148 F.3d 753, 753-54 (7th Cir.1998) (stating that when the "administrator has a conflict of interest ... though the standard of review is nominally the same, the judicial inquiry is more searching"). Upon review of the record, we believe, as did the district court, that the claims of personal bias are speculative
 
 
 [13]
 The Trust claims that the issue Mr. Ross pursued at trial was that the Board abused its discretion in denying him benefits because Rogers was biased against him personally and that his bias infected the Board's decision to deny Mr. Ross' benefits. The Trust states that the question of the Board's consideration of ISTA's accommodations for Mr. Ross was not raised until the post-trial briefing stage of the litigation. In addition, because the district court ordered that the parties file their post-trial submissions simultaneously, the Trust maintains that it was not able to respond to this issue. Therefore, claims the Trust, this point was waived and was an inappropriate ground of decision for the district court to find that the Board had abused its discretion. Given the circumstances presented in this record, we do not think the matter waived
 
 
 [14]
 See supra pp. 1005-06
 
 
 [15]
 ISTA points out that Mr. Ross did not attempt to obtain such a release until after December 3
 
 
 [16]
 Mr. Ross relies on an affidavit obtained from Dr. Johnson in preparation for his summary judgment motion. In that affidavit, Dr. Johnson states that "I do believe that with appropriate reasonable accommodations on the part of ISTA Mr. Ross would have been able to return to work at ISTA, subject to my monitoring of his condition." R.50, Ex.I. However, as ISTA points out, this statement, made in support of a litigation position, stands in fairly stark contrast to the statements in Dr. Johnson's letter to ISTA indicating that he did not believe that Mr. Ross should return to work at all and only if all accommodations were provided. Even in Dr. Johnson's affidavit, he reiterates that "[h]ad all of the[ ] suggested accommodations been agreed to by Mr. Ross's employer, I would have been able to release him to return to work." Id. As we explain, we do not think this testimony sufficient to demonstrate that Mr. Ross was able to perform the essential functions of his job with reasonable accommodations
 
 
 [17]
 In his application for Social Security benefits, Mr. Ross explained that he averaged three meetings per day outside of the UniServ Director office in "Ft. Wayne schools (54 total in FW), the FWES administrative center, or other community facilities such as the Chamber of Commerce." R.87, Ex.51. Moreover, Dr. Keating, the physician who conducted the IME, wrote in his report that Mr. Ross described his job as requiring him "to visit 55 schools within the Fort Wayne Community School District and that he only spends 35-40% of his time in his office." R.87, Ex.72. Ex.72