**Robert C. KOSHINSKI, Jr.,**
**Plaintiff–Appellant,**

v.

**DECATUR FOUNDRY, INC.,**
**Defendant–Appellee.**

No. 98–2790.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 14, 1999.

Decided April 22, 1999.

Charles S. Watson (argued), Springfield, IL, for Plaintiff–Appellant.

Frederic Lee Kenney (argued), Winters, Featherstun, Gaumer, Kenney, Postlewait & Stocks, Decatur, IL, for Defendant–Appellee.

Before BAUER, ROVNER, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

This appeal raises a unique and nettlesome question: May an employer use the ADA as a sword to keep off the job an employee who is qualified to do that job now, but will, at some future point, become unable to do it due to a degenerative disease, which will be exacerbated by the employee's continued employment? The question requires a balancing of, on the one hand, the employer's interest in protecting its employees from injury and itself from liability and, on the other, a disabled employee's interest in earning a living while he can, until he becomes utterly unable to work. It's a tough question. But we only flag the issue for today because we can resolve this appeal by answering a narrower question.

A cupola is "a cylindrical shaft blast furnace for remelting . . . iron before casting."[1] Robert C. Koshinski, Jr. operated a cupola for Decatur Foundry, Inc., a small, family-run business in Decatur, Illinois. To do his job properly, Koshinski had to operate a pneumatic hammer and chisel, a pressurized water hose, various hand tools, a hand joist, fork truck and bobcat, he had to go up and down a chain ladder, lift 80 to 100 lb. bags and boxes, lift slabs and bricks into overhead position and pound them into place with a hammer or mallet, and paint and shovel. The job was physically taxing, to say the least.

In late 1995 Koshinski experienced pain in his left wrist. He told his supervisor at the foundry about his pain and made an appointment with his personal physician, Dr. Edmund Raycraft. In the patient history information Koshinski provided to Dr. Raycraft he stated he was experiencing "constant pain with use" and "nothing" could relieve his pain. Dr. Raycraft suspected that Koshinski had "Kienbock's

---

1. Webster's II New Riverside University Dictionary 336 (1994).

Disease," a condition causing the lunate (the small bone in the wrist) to collapse, which decreases movement of the wrist and causes great pain. *See The Kienbock Disease Information Center* (visited Mar. 30, 1999) <http://www.visitations.com/kienbock>. A visit to a hand specialist for further assessment and treatment was recommended. But Dr. Raycraft released Koshinski to return to work with "light duty," for which the cupola operator job most certainly did not qualify.

Before he could return to work, Koshinski had to be examined by the foundry's physician, Dr. David Fletcher. Dr. Fletcher examined Koshinski on February 12, concluding that Koshinski had "non-occupational" (i.e., not caused by injury or trauma suffered at work) degenerative osteoarthritis and assessed his situation as follows:

> The question is, in regards to this case, what is [Koshinski's] present work capacity. He certainly has the grip strengths to do his current job [Fletcher tested Koshinski's grip strengths at an average of about 95 lbs. for his right hand and about 99 lbs. for his left], but based on his underlying degenerative osteoarthritis he will be getting to a point where he will wear out and not be able to do the heavy physical labor.
>
> In the long term, he needs to do an alternate job. I feel the patient could go back to work right now with no high force/high frequency repetitive tasks and no exposure to vibration.

Dr. Fletcher agreed with Dr. Raycraft that Koshinski should see a specialist, and Raycraft recommended Dr. M. Greatting. Koshinski made an appointment for March 20. In the interim, Dr. Raycraft released Koshinski to return to work "as wrists allow." Dr. Fletcher performed a follow-up examination on February 20, again testing Koshinski's grip strength, this time noting an average of 93 lbs. for the right hand and 76 lbs. for the left. Fletcher concluded that Koshinski "needs some permanent accommodation in the work place

if possible for his non-occupational condition. I recommend no exposure to vibration, no high force/ high frequency repetitive tasks." Because the cupola operator job required Koshinski to be exposed to all of those things, the foundry kept him off the job pending his meeting with Dr. Greatting.

Koshinski saw Dr. Greatting on March 20 as scheduled. Greatting agreed with Dr. Fletcher's diagnosis of degenerative osteoarthritis and concluded that Koshinski "may return to work with no prolonged exposure to vibration no high frequency/high force repetitive tasks." Dr. Fletcher saw Koshinski again on March 28 and basically threw up his hands: "At this point, I have nothing further to offer him. He needs to change his occupation."

Based on these reports, on April 9, 1996, the foundry rather subtly let Koshinski go. Tommy Young, the foundry's vice-president, wrote: "[A]t the present time the Decatur Foundry does not have work available for you within the limits set by your doctor. Please contact Bruce Johnson as soon as possible to complete whatever paper work that is necessary and to receive any checks due." Koshinski protested. He knew the job required him to do all of the things his doctors recommended he refrain from doing, and he knew he would exacerbate his condition if he returned to the job. But he wanted to go back to work and Dr. Raycraft supported him in his mission. In a June 11, 1996, letter, Dr. Raycraft urged the foundry to reconsider its decision:

> While [Koshinski] does have osteoarthritis, which is long standing, I believe he can work as tolerated with this. I do not think that any other interventions are indicated at the current time. I think his only limitations will be dictated by his pain, which at the current time, is not intense at all.

Whether the foundry specifically responded to Dr. Raycraft's intervention is unclear. But Koshinski never resumed his cupola operator duties. Instead, he sued,

claiming that the foundry's refusal to reinstate him violated the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

The district court found Koshinski was not covered by the ADA because he could not perform the essential functions of the job and was therefore not a "qualified individual with a disability." The court entered summary judgment for the foundry and Koshinski appeals, arguing that the evidence showed he could perform the essential functions of the job. To support his claim, he cites Dr. Fletcher's February 12 statement that Koshinski "certainly has the grip strengths to do his current job" and Dr. Raycraft's June 11 statement that Koshinski "can work as tolerated." Koshinski also cites Dr. Fletcher's deposition testimony, where Fletcher reiterated that in March of 1996 Koshinski had the physical strength to do the work.

▪ To qualify for protection under the ADA Koshinski had to show that he was "a qualified individual with a disability," 42 U.S.C. § 12112(a) (1997), i.e., that "with or without reasonable accommodation, [he] can perform the essential functions of the employment position that [he] holds or desires." *Id.* § 12111(8). *See also Ross v. Indiana State Teacher's Ass'n Ins. Trust,* 159 F.3d 1001, 1013 (7th Cir.1998) ("plaintiff bears the burden of establishing that he is a 'qualified individual with a disability' "), *cert. denied,* —— U.S. ——, 119 S.Ct. 1113, 143 L.Ed.2d 109, 67 U.S.L.W. 3394, 67 U.S.L.W. 3415 (1999). The determination regarding whether an individual is qualified must be made "as of the time of the employment decision." *Ross,* 159 F.3d at 1013 (citing *Nowak v. St. Rita High Sch.,* 142 F.3d 999, 1003 (7th Cir.1998)). In short, Koshinski had to show that, when the foundry let him go on April 9, 1996, he could operate the cupola.[2]

▪ In April 1996 the evidence all pointed to the same conclusion: Koshinski could no longer operate the cupola. Drs. Fletcher and Greatting both recommended that Koshinski avoid vibration, high force repetitive tasks, and high frequency repetitive tasks. Koshinski readily admits that his job necessarily involved all of these things. Koshinski argues that Dr. Fletcher's February 12 statement that he "certainly had the grip strengths to do his current job" is enough to create a triable issue of fact as to whether he was able to perform the essential functions of his job. But it's not. Even after he made that observation, Dr. Fletcher nonetheless recommended, just a sentence later, that Koshinski avoid high force/high frequency repetitive tasks—something he could not do as cupola operator. Dr. Fletcher's February 20 and March 28 examinations confirmed this assessment. Significantly, Dr. Fletcher's February 20 examination showed that Koshinski's grip strength had already deteriorated. Koshinski cannot make a case out of a single statement taken out of context. *See Ross,* 159 F.3d at 1012–13 (to defeat summary judgment, party must "supply evidence sufficient to allow a jury to render a verdict in his favor"; presenting only a scintilla of evidence or mere conclusory allegations will not defeat summary judgment). Even Dr. Raycraft, who appeared to support Koshinski's self-destructive wish to return to this particular job, agreed that Koshinski should look for a different line of work. Though he stated that Koshinski could work "as wrists allow," he clarified at his deposition that even if Koshinski was a trooper, willing to bear considerable pain, he still should change jobs if his pain was anything more than mild. And according to Koshinski himself, the pain was debilitating.

▪ Koshinski told Dr. Raycraft he was in constant pain from which he could get no relief. He told the Social Security Administration: "If I pick up something heavy left wrist hurts. After using for a while doing things wrist swells. Left wrist

---

2. Koshinski has not challenged the foundry's inability to find him a replacement job, so the only issue before us is the foundry's refusal to reinstate him in the cupola operator job.

aches constantly. Do any hammering or bending or something wrist hurts bad." These statements, made in an application for disability benefits filed May 16, 1996, show Koshinski believed he could no longer operate the cupola. Koshinski reaffirmed the statements from his disability application during his deposition in this case. He flat out admitted at his deposition that from February 5 through at least May 16, when he filed his application for disability benefits, he was incapable of meeting the rigorous demands of the cupola operator position. He acknowledged that there was no way to do the job of cupola operator without subjecting himself to the very things his doctors recommended he stay away from—namely, vibration, high force repetitive tasks, and high frequency repetitive tasks. Based on this evidence, the district court correctly concluded that Koshinski could not perform the essential functions of his job. Koshinski may have shown that he wanted to return to work despite the risk of pain and harm, but that is not the test. He had to show that he was qualified to do the job. And neither he nor his doctors thought he was.

Koshinski argues that the ADA is not a paternalistic statute designed to protect a disabled person from himself, and that an employee should not be fired or otherwise denied employment because he may become unwilling to do his job at some point in the future. In principle we do not disagree with Koshinski's argument. It would be hard to imagine, for example, that a court would sanction an employer's decision to fire a qualified employee simply because his degenerative heart disease makes a future heart attack inevitable. But here the record firmly established that Koshinski could not perform the essential functions of his job when the foundry decided to let him go.

Koshinski wanted to go back to work despite the pain and the harm he would cause himself—understandable, given that the foundry paid him twice the hourly wage he was able to earn from subsequent employers. He argues that the foundry should have allowed him to go back to work even if it meant that he would suffer considerable pain and cause his condition to worsen. That a person may cause a direct threat to himself, he argues, is of no consequence under the ADA. *Kohnke v. Delta Airlines, Inc.*, 932 F.Supp. 1110, 1111–12 (N.D.Ill.1996), in which the district court held that the "direct threat" language in the ADA refers to direct threats to other individuals, not to the disabled person himself, supports his position. *But see* 29 C.F.R. § 1630.2(r) ("Direct Threat means a significant risk of substantial harm to the health or safety **of the individual** or others that cannot be eliminated or reduced by reasonable accommodation.") (emphasis added). The "direct threat" issue arises, however, only after an ADA plaintiff has made out a prima facie case, as an employer's defense to the challenged adverse employment decision. *See* 42 U.S.C. § 12113(b). Because Koshinski cannot show that he was entitled to protection under the ADA, we do not reach the question of whether the foundry had a valid defense for refusing to reinstate him.

For these reasons, the judgment of the district court is affirmed.