**Samuel O. LEVERETT, Jr., Plaintiff,**

v.

**CITY OF INDIANAPOLIS and Indianapolis Fire Department, Defendant.**

**No. IP 97–726–C–B/S.**

United States District Court, S.D. Indiana, Indianapolis Division.

May 19, 1999.

950

Terry R. Curry, Butler Hahn Hill & Schembs, Indianapolis, IN, Elizabeth Filipow, Indianapolis, IN, for plaintiff.

Jan Keefer, Mark J. Romaniuk, John T.L. Koenig, McHale Cook & Welch, Indianapolis, IN, for defendant.

### ENTRY FOLLOWING BENCH TRIAL

BARKER, Chief Judge.

This matter was the subject of a bench trial on April 19–21, 1999, in which Plaintiff, Samuel O. Leverett, Jr. (Leverett), claimed that Defendants, City of Indianapolis and Indianapolis Fire Department (collectively referred to as "the City"), violated the Americans with Disabilities Act (ADA) by rejecting him for the position of firefighter based solely on his total and permanent hearing loss in his left ear. For the reasons discussed below, we find Defendants *NOT LIABLE* because (1) Plaintiff is not a "qualified individual" under the ADA, and (2) the City's hearing requirement is job-related and consistent with business necessity.

### I. FINDINGS OF FACT

Samuel Leverett has a total and permanent hearing loss in his left ear. Despite his hearing loss, Leverett has led a normal life and never encountered problems in school or the work place relating to his impairment until he tried to qualify as a professional firefighter.

On November 6, 1996, Leverett believed he was finally going to get his opportunity to become a firefighter with the IFD. After successfully completing all the necessary agility and written tests, Leverett received a conditional offer of employment. According to the offer, Leverett thereafter

simply had to pass a psychological and physical examination to be hired. Unfortunately, the physical examination proved to be an insurmountable hurdle for Leverett.

The examination was conducted on November 11, 1996 by Dr. Steven Moffatt (Moffatt), a physician under contract with the City to perform such examinations. The exam extended over an hour and a half and tested, among other things, Leverett's hearing, vision, blood pressure, and flexibility. The hearing test lasted four to five minutes and measured Leverett's perceptions at four different frequencies through a headset as he sat in a sound booth. The results disclosed to Dr. Moffatt that Leverett suffered from a total hearing loss in his left ear. Based on that impairment, Leverett failed to satisfy the City's hearing requirement that every firefighter candidate be capable of a minimal level of hearing in *both* ears.[1]

After the examination, Dr. Moffatt requested that Leverett submit to further testing at the Ear and Balance Institute in Indianapolis. There, audiologist Lisa Busald (Busald) performed a comprehensive audiogram, which included testing Leverett's ability to hear live sounds through headphones in a sound booth. The results confirmed Leverett's left ear deafness. Busald also performed a speech discrimination test, which Leverett passed with a nearly perfect score. Unfortunately, Busald was unable to test Leverett's ability to localize sound, since she did not have the technology necessary to conduct that test;

in fact, she did not believe that such a test even existed at the time.[2]

After the examination, Busald discussed with Leverett the possibility that his hearing problem might be correctable with a Telex CROS hearing instrument (CROS set).[3] Although Busald was unable to test Leverett with a CROS set because she did not have one available, she informed Leverett that it might assist him in localizing sound. Leverett responded by offering to pay for a CROS set if it would help him pass the City's hearing requirement, to which Busald replied that she would report her findings and Leverett's offer to Dr. Moffatt. Busald did just that, sending Moffatt a letter dated November 19, 1996, which detailed the test results and Leverett's offer to buy the CROS set. Moffatt subsequently asked Busald to clarify her November 19th letter by answering three specific questions, one of which was "would the CROS system improve [Leverett's] localization?" (Plaintiff's Exhibit 2). Busald responded to that question as follows:

> I don't know. Some of my patients wearing a CROS system report improved localization [sic] some do not. I have no means of testing available to measure improved localization using a CROS system.

(Plaintiff's Exhibit 2). Based on Busald's reports, Dr. Moffatt concluded that Leverett had a hearing problem which could not be accommodated, prompting Moffatt to send a letter dated November 22, 1996 to David Harris ("Harris"), IFD's personnel

---

1. This was not the first time Leverett had tried to become a firefighter. In the Spring of 1996, he applied for a professional firefighter position with the Washington Township Fire Department, but was not offered a position. Undeterred, in Summer of 1996, Leverett applied for a volunteer firefighter position with the Franklin Township Fire Department. Franklin Township accepted Leverett into its training program and Leverett proceeded with three to four weeks of classroom training. He then withdrew from the program after he received his conditional offer from IFD. Neither Washington Township nor Franklin Township gave Leverett a hearing test, but Leverett did inform Franklin Township of his hearing loss.

2. Busald also tested Leverett with a conventional hearing aid, but it proved ineffective by all accounts.

3. CROS is an acronym for contralateral routing of signal. The CROS set uses a microphone in the bad ear to pick up sound and broadcast it via an FM signal to a receiver in the good ear. In theory, the CROS set solves localization problems for those individuals, like Leverett, with unilateral hearing.

manager, to inform Harris that Leverett failed the City's hearing requirement. (Plaintiff's Exhibit 1). Harris, in turn, sent Leverett a letter dated December 2, 1996, rejecting Leverett for the firefighter position because his "Post–Offer evaluation results for the Indianapolis Fire Department was [sic] not sufficient." (Plaintiff's Exhibit 15). After receiving the rejection letter, Leverett spoke with Harris by telephone, in which conversation Harris told him that his hearing loss was the reason for his rejection.

After the City rejected Leverett, he contacted an attorney and this litigation ensued. During the course of this suit, Leverett has been given at least two additional hearing examinations which, among other things, tested his ability to localize sound. First, in February 1999, Dr. Dale O. Robinson ("Robinson") tested Leverett's ability to localize sound unaided. In March 1999, Dr. Sigfrid D. Soli ("Soli"), a specialist based in California, tested Leverett's ability to localize sound and to discriminate among sounds both unaided and while using a CROS set. The parties disagreed over the meaning of the test results and the significance of those results in terms of the merits of this lawsuit. This litigation culminated in the three day bench trial conducted on April 19, 20, and 21, 1999.

The City's hearing requirements, along with its other medical requirements, parallel the Baseline Statewide Physical and Mental Examination Standards ("Baseline Standards"), which were established by the Board of Trustees of the Public Em-

ployees' Retirement Fund ("PERF") to provide guidelines for membership in the 1977 Public Employee's Retirement Fund ("the Fund"). See 35 IAC § 2–9–6–2.[4] Since Indiana law requires that all firefighters meet the conditions for acceptance into the Fund, (see Ind.Code § 36–8–3–21(b)), the City adopted the Baseline Standards to ensure that its firefighter applicants satisfy those membership guidelines.[5] The IFD is not alone in adopting the Baseline Standards; other PERF members, including the Warren Township, Washington Township, Greenwood, and Muncie fire departments (all located in central Indiana), have adopted the Baseline Standards for their applicants as well. (See Leverett Aff. ¶ 11; Exhibit 3 to Harris Aff.).[6]

## II. CONCLUSIONS OF LAW

▮▮▮ To qualify for protection under the ADA, Plaintiff must first establish that he is "a qualified individual with a disability." 42 U.S.C. § 12112. Assuming Leverett's left ear hearing loss constitutes a "disability" under the Act, Plaintiff must still establish that he is a "qualified individual." See Koshinski v. Decatur Foundry, Inc., 177 F.3d 599, 602 (7th Cir.1999). To do so, Leverett must prove he could perform the "essential functions" of the job of a firefighter with or without reasonable accommodation. 42 U.S.C. § 12111(8); DePaoli v. Abbott Laboratories, 140 F.3d 668, 674–75 (7th Cir.1998); Matthews v. Commonwealth Edison Co., 128 F.3d 1194, 1195 (7th Cir.1997). The

---

**4.** PERF was formerly a defendant in this case.

**5.** The Baseline hearing standard, and by extension the City's hearing standard, is virtually identical to the hearing standard adopted by the National Fire Protection Association (NFPA).

**6.** The fire departments belonging to PERF, including the IFD, seem to regard the Baseline Standards as requirements for membership into the Fund, rather then merely suggested guidelines. Whether the Baseline Standards are properly treated as guidelines or requirements is unclear. Thomas Parker,

director of PERF, testified that the Baseline Standards are simply guidelines for membership, not hard-and-fast requirements. According to Parker, if a local appointing authority (who is member of the local fire department) certifies a firefighter for PERF membership, even if that firefighter has not satisfied the Baseline Standards, PERF would grant membership to that firefighter. Such a scenario is rare, however, and the IFD has consistently operated on the assumption that candidates for the Fund must satisfy the Baseline Standards.

regulations applicable to the ADA define "essential functions" as "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1).

■ The parties agree that the essential functions of a firefighter include, among other things, assisting in rescue operations and communicating by voice.[7] The parties also seem to agree that localizing sound and discriminating among sounds are necessary to the performance of those essential functions. The parties disagree, however, about whether localizing sound and discriminating among sounds are themselves essential functions of the job. Defendants contend that they are essential functions because of their importance in performing the duties of a firefighter. Plaintiff, however, claims that "essential functions," as that term is used in the ADA, refers to actual job duties, such as conducting rescue operations, and not to skills which are simply important to performing those duties, such as the ability to localize sound.

Ultimately, this debate is only academic because the record makes clear that localizing sound and discriminating among sounds are both necessary to performing many of the undisputed essential functions of a firefighter, such as conducting search and rescue operations. Indeed, Dr. Robinson (Plaintiff's Expert), Dr. Soli (Defendants' Expert), Chief James Greeson (IFD Fire Chief), and Richard Longerich (IFD Director of Training) all testified to that fact specifically. Thus, Plaintiff must prove that he can both localize sound and discriminate among sounds to establish that he can perform essential functions of the job of a firefighter.[8] Absent such a showing, Plaintiff is not a "qualified individual" and, thus, does not fall within the ADA's protections.

Assuming *arguendo* that Leverett's ability to discriminate among sounds is sufficient to enable him to perform the essential functions of a firefighter,[9] Plaintiff still must establish that he can sufficiently localize sound. This raises a complicated issue because, according to the testimony of the experts for both sides, there is no widely accepted standard or test with which to measure an individual's ability to localize sound.[10] Notwithstanding that fact, Dr. Robinson (Plaintiff's expert)[11] and Dr. Soli (Defendants' expert)[12] both tested Leverett for sound localization us-

7. The parties agree that the essential functions for a firefighter include at least those duties listed in the official job description. (Plaintiff's Exhibit 4).

8. Plaintiff attempts to circumvent his prima facie burden by immediately addressing the City's defense that its hearing requirement is job-related insofar as it addresses a "direct threat." The Seventh Circuit in *Koshinski v. Decatur Foundry, Inc.*, 177 F.3d 599, 602 (7th Cir.1999), recently reminded us, however, that "the 'direct threat' issues arises [ ] only after an ADA plaintiff has made out a prima facie case, as an employer's defense to the challenged adverse employment decision." *See also Andrews v. State of Ohio*, 104 F.3d 803, 808 (6th Cir.1997).

9. Audiologist Lisa Busald tested Leverett's discriminatory ability and found it to be nearly perfect. Dr. Soli then tested Leverett's ability to discriminate using his Hearing in

Noise Test ("HINT"). The parties dispute whether the results of the HINT test support the notion that Leverett can discriminate among sounds well enough to perform the essential functions of a firefighter. We need not resolve this dispute, however, because it has been rendered moot by our rulings on other issues in the case.

10. Unfortunately, the lack of such a uniform standard or test does not obviate the importance of localizing sound for a firefighter.

11. Dr. Robinson has been a Professor of Audiology at Wayne State University since 1974 and has a Ph.D. in Audiology.

12. Dr. Soli is the Vice–President and Director of Hearing Aid Research at the House Ear Institute in Los Angeles, California, which is one of the largest private hearing clinics in the country. He has a Ph.D. in experimental psychology and has been working in the hearing impairment field for sixteen years.

ing different testing methods and standards. Plaintiff relies on the results from both tests in his attempt to establish that he can localize sound sufficiently well to satisfy the essential functions of a firefighter. Unfortunately for Plaintiff, we view the test results as being, at best, inconclusive and, at worst, demonstrative of Leverett's inability to localize sound.

The first test was conducted by Dr. Robinson in February 1999. Leverett requested the examination in the Fall of 1998, but, at that point, Dr. Robinson did not have a test for localization nor was he aware of any such test. Responding to the request, however, Dr. Robinson created a sound localization test specifically for Leverett. Although the test was arguably better than nothing, it had never be used on anyone else nor had it been subject to any outside peer review. The test also lacked a control group, rendering its results all but useless in determining Leverett's ability relative to an average hearing person.

Assuming we accept Dr. Robinson's test results as reliable, they hardly constitute a strong endorsement of Leverett's ability to localize sound. The test contains two sections—speech-in-noise and warble tone—which are both comprised of two trials. "Speech-in-noise", the first section tested, had Leverett coming out of the gate strong. He had accuracy ratings of 96% and 100% respectively on the two trials, in which Leverett was asked to identify from which direction the word "help" was coming as that word was spoken against a noisy background. (Defendants' Exhibit O). His stellar performance was short lived, however, as his scores plummeted on the "warble tone" section of the test, in which Leverett was asked to identify from which direction a pure tone was coming as that tone was played against a noisy background. The "warble tone" section, like the "speech-in-noise" section, consisted of two trials; here Leverett had only a 46% accuracy rate in the first trial and a 12% accuracy rate in the second. (Defendants' Exhibit O).

At trial, Dr. Robinson downplayed the significance of the warble tone test results by suggesting that a pure tone does not trigger cognitive signals comparable to the response to the word "help" in the speech-in-noise testing. Following that reasoning, a subject should typically score lower on the warble tone section than on the speech-in-noise section, as Leverett did. While that may be true, we have no way of knowing whether an individual with "normal" hearing or, more to the point, an individual able to perform the essential functions of a firefighter, would score as poorly as Leverett did. Given Dr. Robinson's statement that he was surprised Leverett scored so low, we suspect the low scores may well reflect an inability by Leverett to sufficiently localize sound. At the very least, Plaintiff's reliance on these test results is clearly misplaced, as they fail to establish that he can localize sound sufficient to perform the essential functions of a firefighter.

Plaintiff next contends that the results of Dr. Soli's testing establish that he can localize sufficiently to perform the essential functions of a firefighter. This position is also unsupportable, as explicated below.

Dr. Soli's localization test is referred to as the Source Azimuth Identification in Noise Test (SAINT). This test requires the subject to identify the directions from which sounds originate. The target sounds emanate from one of twelve loudspeakers positioned in a circle with a radius of 1 meter around the subject. (Defendants' Exhibit AC). The speakers are numbered 1–12 and are positioned at the "hour" positions of a horizontal clock face. (*Id.*) The subject sits in the center of the circle facing the 12 o'clock loudspeaker. (*Id.*) Target sounds are presented from eight of the twelve speakers, although the subject can identify any of the 12 speakers as the location of the target sound. (*Id.*) Target locations are varied randomly, and sounds are presented from each target location six different times during a test,

for a total of 48 presentations per test. (*Id.*)

The SAINT test is actually comprised of four examinations: (1) impulsive gunshot sound in quiet, (2) human vocalization in quiet, (3) impulsive gunshot sound in helicopter noise, and (4) human vocalization in crowd noise. Scores are computed for each part in terms of percent perfect accuracy (i.e., the subject's response location is identical to the target sound location) and percent approximate accuracy (i.e., the subject's response location is identical to or within one clock position of the target sound location).

On March 7, 1999, Leverett was administered the SAINT test at the House Ear Institute by Andrew Vermiglio, a staff audiologist at the Institute, performing the test under the overall direction of Dr. Soli. Leverett's percent perfect accuracy was recorded as follows:

| Listening Condition | Normal Hearing | Leverett |
|---|---|---|
| Gunshot in Quiet | 93.4 | 34.5 |
| Voice in Quiet | 85.6 | 38.3 |
| Gunshot in Helicopter Noise | 75.8 | 50.0 |
| Voice in Crowd Noise | 41.9 | 6.3 |
| Average | 74.2 | 32.3 |

(Defendants' Exhibit AC). Leverett's percent approximate accuracy was recorded as follows:

| Listening Condition | Normal Hearing | Leverett |
|---|---|---|
| Gunshot in Quiet | 100.0 | 81.3 |
| Voice in Quiet | 94.2 | 85.1 |
| Gunshot in Helicopter Noise | 93.2 | 81.3 |
| Voice in Crowd Noise | 65.8 | 33.3 |
| Average | 88.3 | 70.3 |

(Defendants' Exhibit O).[13]

Although the results seem to confirm or suggest Leverett's inability to localize sounds, Plaintiff claims that they actually establish that he can localize well enough to perform the essential functions of a firefighter. In advancing this conclusion,

Plaintiff largely ignores the perfect accuracy results, focusing instead on his approximate accuracy. Plaintiff, for example, points out that his approximate accuracy score would be slightly higher than reported if Dr. Soli had used the same criteria used to determine the norming average for that test.[14] Plaintiff's emphasis is inappropriate, according to Dr. Soli, because firefighters are often required to rely exclusively on their hearing and sense of touch. Hence, the ability to localize needs to be precise—not just approximate. Richard Longerich ("Longerich"), the director of training for the IFD, illustrated Dr. Soli's point well when he testified that firefighters often need to pinpoint a victim's precise location in order both to expedite the rescue and ensure the safety of the victim. Longerich, for example, testified that he once rescued a fellow firefighter by cutting through a wall with an ax. Longerich could not see the trapped firefighter, so he made the cut based on his ability to localize the victim's voice. A rough estimate of the victim's location (as opposed to a precise location) may have resulted in injuring the victim or wasting valuable time cutting into the wrong area. In addition to this example, we heard other compelling testimony from Longerich and other witnesses concerning the importance of time and quick judgments in firefighting situations. Based on that testimony, we are convinced that the need for precise hearing accuracy in firefighting is real and of vital importance.

Assuming the approximate accuracy scores were reliable and should be accorded equal weight to the perfect accuracy scores, we nevertheless are faced with Leverett's having seriously failed one of the two tests and having achieved a respectable result on the other. These re-

---

**13.** These results reflect Leverett's ability to localize sounds *unaided*.

**14.** Dr. Soli credited Leverett on the approximate accuracy test when his response location was identical to or within one clock position of the target sound location, whereas the norming sample was credited when their response locations were within *two* clock positions of the target sound location. According to Plaintiff, crediting Leverett with similar responses would have increased his approximate accuracy percentage to 75.

sults thus are inconclusive, but more likely demonstrate that Leverett cannot localize sound.

Perhaps sensing that the SAINT results were not necessarily in his favor, Plaintiff attempts to discount the reliability of the test. First, he correctly points out that the norming sample for the test was comprised of only ten individuals. According to Dr. Robinson, such a low sample size is insufficient to create a reliable average from which to judge a subject's ability to localize sound. Dr. Soli, the creator of the test and an expert in statistics, disagrees, maintaining that a ten person sample size is sufficient to create a meaningful average and standard deviation from which to judge Leverett as well as any other subject. A larger sample size obviously would be preferable in establishing reliability of the results, but we remain unconvinced that the test results lose all their meaning or significance simply because the sample size was comprised of only ten individuals. In any event, Plaintiff provided us with no proof to that effect.

Plaintiff also claims that the SAINT test is more rigorous that the City's hearing requirement because the norming sample for the SAINT test was comprised exclusively of individuals who could pass the City's hearing requirement. Indeed, the average hearing of those in the norming. sample was 20dB and an individual satisfies the City's hearing requirement with 30dB hearing.[15] Hence, an individual with hearing between 20dB–30dB could satisfy the City's hearing requirement and at the same time fail the SAINT test. According to Plaintiff, this fact establishes that the SAINT test is not an accurate determinant of whether Leverett can localize sufficient to perform the essential functions of a firefighter.[16] The City counters that, while the difference might effect marginal candidates, Leverett's scores were so poor on the SAINT test that he clearly would fall below the norm even if the test standards were made easier.

We agree with the City on this point. Although the SAINT test appears slightly more difficult, we are persuaded that, even accounting for the difference, Leverett would be far short of the normal ranges for sound localization on the SAINT test.

Assuming *arguendo* that Plaintiff is correct—that the SAINT test results are unreliable and meaningless—it does not change the fact that there is a dearth of evidence that Leverett can localize sound sufficient to perform the essential functions of a firefighter. In fact, the evidence seems clearly to support the opposite conclusion. Leverett, himself, testified that his left ear hearing loss impedes his ability to localize sound, particularly with regard to quick, one time sounds. The only evidence obviously in Plaintiff's favor is Dr. Robinson's conclusory statement that Leverett can perform all the duties of a firefighter without accommodation. Of course, this statement is directly contradicted by Dr. Soli's testimony that Leverett cannot perform all the duties of a firefighter with or without an accommodation and even appears somewhat inconsistent with Dr. Robinson's own test results, not to mention the SAINT test results. In the end, Plaintiff fails to establish by the preponderance of the evidence that he can localize sound and, therefore, perform the essential functions of a firefighter.

15. "dB" stands for decibel, which is a measurement of the volume of the noise. The dB score indicates the lowest perceptible volume one can hear. Hence, the lower the dB score the better one's hearing is.

16. Plaintiff also suggests that it was discriminatory for the City to give Leverett the SAINT test because other firefighter candidates do not have to pass that test to become a fire-

fighter. Leverett misses the point. Every firefighter candidate, including Leverett, has to pass the City's hearing test to become a firefighter. Had Leverett passed that test, he would have been hired. By allowing Leverett a second opportunity to become a firefighter by taking the SAINT test, the City actually gave Leverett two bites at the apple.

This conclusion does not necessarily completely foreclose Leverett from relief, however. He may still be a "qualified individual" if he can perform the essential functions of the job with a reasonable accommodation. *See* 42 U.S.C. § 12111(8); *DePaoli v. Abbott Laboratories,* 140 F.3d 668, 674–75 (7th Cir.1998). Plaintiff maintains he can do that with a CROS Set hearing device. Defendants respond that even with a CROS set Leverett still would be unable to perform the essential functions.[17]

Unfortunately for Plaintiff, the evidence adduced at trial does not support his belief that the CROS set would improve his ability to localize sound. Only Dr. Soli tested Leverett's ability to localize with the CROS set, and he concluded that the CROS set actually degraded Leverett's localization ability. That assessment is entirely consistent with the raw data from the test itself, which shows Leverett scoring much lower in every localization category when aided by the CROS set. (Defendants' Exhibit AC.) Although Dr. Robinson disagrees with Dr. Soli's conclusion and testified that Leverett's ability to localize would improve with a CROS set, Dr. Robinson never tested Leverett with a CROS set. Even Lisa Busald, who first suggested the CROS set as a possible accommodation, wrote in a letter to Dr. Moffatt that she didn't know if the CROS set would improve Leverett's ability to localize because she had "no means of testing available to measure improved localization using a CROS system." (Plaintiff's Exhibit 2). Her uncertainty was underscored further when she wrote that "[s]ome of my patients wearing a CROS system report improved localization [sic] some do not." (*Id.*)[18] Clearly, Plaintiff has not established by a prepon-

derance of the evidence that he could perform the essential functions of a firefighter with the CROS set, which is the only accommodation at issue. Accordingly, we find that Plaintiff is not a "qualified individual" under the ADA because he cannot perform the essential functions of a firefighter with or without a reasonable accommodation.

**1. THE CITY'S HEARING REQUIREMENT IS JOB–RELATED AND CONSISTENT WITH BUSINESS NECESSITY**

Assuming *arguendo* that Leverett is a "qualified individual with a disability," Plaintiff's claim nonetheless would fail because he was rejected based on a qualification standard (the City's hearing requirement) that was job-related and consistent with business necessity.

The ADA provides:

It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation. . . .

42 U.S.C. § 12113. The regulations define "qualification standards" as:

the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired.

---

**17.** Defendants also contend that Leverett failed to request a reasonable accommodation and that the City proposed a potential accommodation which Leverett implicitly rejected by his inaction. Because the claim fails on other grounds, we need not resolve these arguments.

**18.** Similarly, the Northern District of Illinois in *Karbusicky v. City of Park Ridge,* 950 F.Supp. 878 (N.D.Ill.1997), found that a CROS Set did not enhance a police officer's ability to localize who suffered from a total hearing loss in his left ear.

29 C.F.R. § 1630.2(q). The defendant has the burden to demonstrate that a qualification standard is job-related and consistent with business necessity. *See Andrews v. Ohio,* 104 F.3d 803, 807–808 (6th Cir.1997).

The City's hearing requirement clearly constitutes a qualification standard, as it is a medical requirement which must be satisfied to be a firefighter with the IFD. The ADA provides that "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the work place. 42 U.S.C. § 12113(b). The regulations define a direct threat as: "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r); *see also Koshinski v. Decatur Foundry, Inc.,* 177 F.3d 599, 602 (7th Cir.1999). The regulations also provide that:

> The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
>
> (1) The duration of the risk;
>
> (2) The nature and severity of the potential harm;
>
> (3) The likelihood that the potential harm will occur;
>
> and
>
> (4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r).

The City contends that its hearing test provided an individualized assessment of whether Leverett posed a "direct threat" because it measured, albeit indirectly, Leverett's ability to localize sound. While Plaintiff acknowledges that localizing sound is critical to the safe performance of the duties of a firefighter, he contends that the City's hearing test did not assess whether Leverett could localize sound. Hence, that test did not establish whether Leverett was a "direct threat."

The dispute in this case is not whether firefighters must be able to localize sound to safely perform their job, but how the ability to localize can most appropriately be measured and how the City may distinguish those firefighter applicants who are probably capable of safely performing the job from those firefighter applicants who are probably not capable. The City's hearing test was not created arbitrarily, but rather was based upon the well supported medical opinion that the ability to hear in both ears relates directly to one's ability to localize sound and thus to perform the essential functions of a firefighter. Dr. Soli, Dr. Moffatt, and Audiologist Lisa Busald all testified that such a relationship exists.

Plaintiff argues that such an opinion is not universally held in the medical community (i.e., Dr. Robinson disagrees) and that some applicants with unilateral hearing may be able to localize sounds sufficiently well to perform their jobs. This may well be true, but the law does not require the City to put the lives of Leverett, his fellow firefighters, and the citizens they serve at risk by taking the chance that he can localize sound when, at the time of Leverett's application, measuring localization was a difficult task and when one of the only indicators—the ability to hear from both ears—suggested that Leverett could not localize sufficient to perform the job. The lack of a precise or universally perfect fit between a job requirement and actual safe and effective performance is not fatal to a claim of job-relatedness, particularly when the public health and safety are at stake. *Cf. Smith v. City of Des Moines, Iowa,* 99 F.3d 1466, 1473 (8th Cir.1996). Thus, we hold that the City's hearing requirement is job-related and consistent

with business necessity insofar as it is related to a "direct threat." Accordingly, Plaintiff's ADA claim fails.

## III. *CONCLUSION*

For the reasons discussed above, we find Defendants *NOT LIABLE* because (1) Plaintiff fails to establish that he can perform the essential functions of the job with or without a reasonable accommodation, and (2) Defendants establish that their hearing requirement is job-related and consistent with business necessity.